ORDERED.

Dated:  October 10, 2018

*Cynthia C. Jackson*
Cynthia C. Jackson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

John T. Carter

   Debtor.
_____/

They Might Be, Inc.,

   Plaintiff,

v.

John T. Carter,

   Defendant.
_____/

Case No. 6:14-bk-07895-CCJ
Chapter 7

Adv. No. 6:15-ap-00018-CCJ

MEMORANDUM OPINION

  This is a story of an alternative rock festival gone bad.  It is clear from the evidence that Nerdapalooza, LLC, breached its contract with Plaintiff, They Might Be, Inc. ("TMBI").  The issue is whether the Debtor's actions taken in connection with those breaches arise to the level of fraud or willful and malicious injury so that the resulting debt must be excepted from discharge

under either Section 523(a)(2)(A) or Section 523(a)(6) of the Bankruptcy Code. For the reasons set forth below, the Court finds that they do not.

<u>Findings of Fact</u>

The Debtor/Defendant John T. Carter filed a bankruptcy petition for relief under Chapter 7 of the Bankruptcy Code. Before filing his bankruptcy petition, the Debtor had been a member of Nerdapalooza. The Debtor and others formed Nerdapalooza for the purpose of organizing and promoting annual alternative rock festivals in Orlando, Florida.

In 2013, Nerdapalooza entered into a contract with TMBI, also known as the band "They Might Be Giants," to perform at "Nerdapalooza 2013" for $50,000 (the "Contract"). The Debtor signed the Contract on behalf of Nerdapalooza. Under the Contract, Nerdapalooza agreed to pay TMBI (i) $12,500, six months before the performance, (ii) $12,500, two months before the performance, and (iii) the remaining $25,000, on the night of the performance. Nerdapalooza made the first $12,500 payment two months late, and only after the Debtor borrowed $5,000 from his mother. Nerdapalooza did not make the second $12,5000 payment. Even though Nerdapalooza was in breach of the Contract by failing to make the second $12,500 payment, TMBI flew to Orlando and appeared ready to perform.

Nerdapalooza 2013 was a three-day music festival held at the Orange County Convention Center from Friday, October 18 through Sunday, October 20. They Might Be Giants was the headliner act, with 23 bands playing before them and 16 bands performing the next day. The OCCC venue had a capacity of up to 4,000 attendees. Nerdapalooza needed 2,500 attendees to break even and the members hoped that there would be around 3,000 attendees. The members believed that the festival would attract thousands of attendees based on the research done by one of its members, Joshua Thew. Thew had researched venues at which They Might Be Giants had

performed in Florida over the previous years and based on his analysis of paid attendees, it appeared that Nerdapalooza 2013 would be a success. In the days leading up to the festival, it appeared that Nerdapalooza had sold 700 tickets online. At some point on the day TMBI was set to perform, Nerdapalooza's members learned that those 700 tickets included 467 free tickets given out for the Friday night pre-show. Even then however, the Debtor and Nerdapalooza's other members expected most of the ticket sales to occur at the gate rather than in advance of the festival.

Scott Bozak, TMBI's tour manager and admitted agent, testified that upon arrival at the OCCC on the afternoon of the band's performance, he became concerned about how few attendees were there. Bozak spoke with the Debtor about his concerns. Bozak testified that he "jokingly" asked the Debtor about the low attendance and that the Debtor told him "don't worry about it; everything is great" and "we should be fine." Asked whether this satisfied him, Bozak testified "no, my concern never really went away."

That night, before the band appeared on stage, Bozak spoke with Thew, who brought Bozak a check signed by the Debtor on Nerdapalooza's behalf for $25,000. Bozak told Thew the check should be for $37,500, kept the $25,000 check and told Thew the band would not play until he received the full $37,500. After about ten minutes of waiting for Thew to return however, the band performed.

About an hour after TMBI left the stage, Thew returned and gave Bozak another check (signed by the Debtor) for $37,500, but told Bozak that there were not enough funds to cover the amount of the check. Thew asked Bozak if the band would hold the check for at least a week and consider taking less money. Bozak and Thew then signed a letter to the band's producer outlining the situation and providing a further promise (by Thew) to pay the full amount. Once Bozak and Thew signed the agreement, the band left the OCCC with the $37,500 check.

After holding the check for a week, TMBI tried to cash the check but it bounced. TMBI sent demand letters and sued Nerdapalooza, Thew, the Debtor and others in state court. TMBI obtained a default judgment against Nerdapalooza in state court for the amount of the bounced check plus treble damages, for a total of $150,000 (plus fees and costs), as permitted under Section 68.065, Florida Statutes. On advice of counsel, the Debtor subsequently dissolved Nerdapalooza.

The Debtor then filed his bankruptcy case seeking to discharge any amounts owed to TMBI and TMBI filed this adversary proceeding seeking to have the amounts owed found to be nondischargeable. During the trial of this adversary proceeding, the Debtor learned for the first time – through a TMBI representative – that Thew's research on paid attendees for TMBI concerts was overstated by up to 150%. The evidence at trial also established the following facts in addition to those already stated:

1. This was Nerdapalooza's sixth festival and in the past, profits were "hit or miss" each year. In 2012, Nerdapalooza suffered a $2,000 loss.

2. Nerdapalooza gave any profits from past festivals to charity.

3. Nerdapalooza had never attracted more than 1,000 people in the first six festivals.

4. The members of Nerdapalooza decided to "go big" for 2013 by getting They Might Be Giants to headline.

5. The Debtor and his mother contributed over $10,000 of their own monies toward the festival to make Nerdapalooza 2013 a success.

6. Two of the members of Nerdapalooza were so concerned Nerdapalooza 2013 would fail, that they resigned before the festival.

7. Nerdapalooza had a negative balance going into the festival. This was in part caused by another vendor that charged the company for the band's hotel rooms before it should have.

8. At the end of the festival, checks in the amount of $89,000 bounced.

9. In dissolving Nerdapalooza the Debtor falsely represented to the State of Florida that all creditors were paid in full.

## Conclusions of Law

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt for "money, property, services, or an extension, renewal or refinancing of credit," to the extent it is "obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." Section 523(a)(6) excepts from discharge any debt for a "willful and malicious injury."

Because of the Bankruptcy Code's overriding policy of providing debtors with a fresh start, bankruptcy courts must construe objections to discharge strictly against the creditor and liberally in favor of the debtor.[1] And it is the creditor's burden to prove the exception by a preponderance of the evidence.[2]

To except a debt from discharge under Section 523(a)(2)(A) for false a representation,[3] the creditor must prove (i) the debtor made a false representation with the intent to deceive the creditor, (ii) the creditor relied on the misrepresentation, (iii) that reliance was justified and (iv) the creditor was harmed as a proximate result of the misrepresentation.[4]

After two days of trial and hearing seven different witnesses, the only evidence of representations made by *the Debtor* to TMBI were (i) his statements on the day of TMBI's performance "not to worry", that "everything is great" and "we should be fine" and (ii) his

execution of two bad checks, one of which was issued before the band's performance and one of which was issued afterward.[5]

Although TMBI alleges that Thew and another member (Bryan Kissel) also made actionable misrepresentations (and thereby allege a "conspiracy to defraud"), such allegations, even if proven, are insufficient to except this debt from discharge. That is because, whether brought under Section 523(a)(2)(A) or 523(a)(6), the action or representation at issue must be one taken by *the debtor*. As aptly stated by the Court in *In re Nofziger*:

> Bankruptcy is a uniquely personal act. The debtor's right to receive a discharge is a personal right which should not be denied lightly . . . Therefore, in order to establish that a particular debt is nondischargeable, at a minimum, the creditor must establish that the debtor, not someone else in a chain of co-conspirators, took the offensive act and that the act was directed at the creditor, not someone else.[6]

Accordingly, the first issue is whether the Debtor made a false representation with the "intent to deceive." It is undisputed that despite the Debtor's statement that "everything is great" and "we should be fine", by the end of the three-day festival things were to the contrary. Indeed, by the festival's end, it became clear that there had not been enough ticket sales to pay TMBI or any of the other bands.

The Debtor's affirmative statements made to TMBI are at least in part, opinions rather than assertions of fact. Generally, a stated opinion about a future fact is not actionable.[7] Statements of opinion may be actionable however, when as here, the Debtor had superior knowledge of the underlying facts.[8] As to the checks, there is a split of authority on whether the mere giving of a check in and of itself is a "representation" at all under Section 523(a)(2)(A). Some courts have held that the delivery of a check constitutes an "implied representation" to the recipient that sufficient funds exist to cover the checks.[9] Other courts have held that issuing a check does not

6

constitute any such a representation and is only a directive *to the bank* to transfer the face amount from the account to the bearer of the check.[10] Those courts hold that to be actionable under Section 523(a)(2)(A), the debtor must not only knowingly issue a bad check but also must have affirmatively represented to the creditor that the check is good.[11] Because the Court finds in favor of the Debtor on the discharge issue, the Court need not resolve this split of authority.

Accordingly, for purposes of this opinion, the Court will assume that the Debtor's oral statements and his issuance of the two checks constitute misrepresentations under Section 523(a). The question then becomes whether the Debtor made these representations with the "intent to deceive" TMBI.

To prove an intent to deceive, "the debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in the law, which may exist without the imputation of bad faith or immorality."[12] A determination of whether a debtor had the subjective intent to deceive is an issue of fact and depends largely on the Court's assessment of the credibility and demeanor of the debtor.[13] Because a debtor rarely admits fraudulent intent however, courts look at the totality of circumstances to make that determination.[14]

In determining intent to deceive, one of the circumstances to be considered is "the recklessness of a debtor's behavior."[15] In that regard, the Eleventh Circuit has held that "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may be combined to infer an intent to deceive."[16]

A statement is made in "reckless disregard of the truth if the speaker makes the statement without caring about whether the representation is true or false."[17] This must be distinguished from a speaker who negligently makes a false representation but honestly believes the representation to be true--which is not sufficient to prove intent to deceive.[18] And "if there is

7

room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor."[19]

As to the totality of the circumstances, TMBI argues that from the time the Debtor signed the Contract on behalf of Nerdapalooza, through the festival itself, the Debtor was "extremely reckless" and that such recklessness should result in this Court finding a subjective intent to deceive. The Debtor testified that he never had any intent to deceive TMBI. The Debtor testified that when he made the representations to Bozak and issued the checks he honestly believed there would be a huge amount of gate sales for They Might Be Giants (based on Thew's research) and, as a result of those anticipated sales, as well as the projected ticket sales for the sixteen bands that would play on the next day, he believed that They Might Be Giants would be paid.

Based on the Debtor's testimony, as well as the totality of the circumstances, the Court finds the Debtor was probably negligent (and may have even been reckless in the general sense), but that he had no subjective intent to deceive TMBI. The Court finds the Debtor credible and believes he was sincere in his belief that things would be fine and the band would be paid. The Debtor had information to support this belief (such as internet ticket sales and previous draws by TMBI), although the Debtor learned later that the information was wrong. The Court also finds it important that the Debtor and his family contributed over $10,000 of their own monies to make the festival successful.

It is also important to put all of these circumstances in context. Unlike any other reported decision the Court has found, this was a fluid situation. The fact of the matter was that no one could know the truth or falsity of the statements and whether the check would be covered until the festival concluded. All the parties involved here, including TMBI, were making a gamble that the festival would be successful. In hindsight, the Debtor may have been foolish to believe it would

be successful, but the Court finds that he honestly held that belief. "Honesty requires only that the maker of the representation speak in good faith and without consciousness of a lack of any basis for the truth or accuracy of what he says."[20]  The Court finds exactly that here--that the Debtor spoke in good faith and did not have knowledge that some of his underlying information was not accurate.

And the Court finds no evidence that the Debtor made any representation with reckless disregard for the truth, i.e. "not caring whether it was true".  Indeed, "unfounded optimism of one's difficult financial state does not rise to the level of a reckless disregard for the truth."[21]  In some respects, this proceeding is like gambling cases bankruptcy courts have examined under Section 523(a)(2)(A).  In many of those cases, when the Court finds the debtor honestly believed that he could repay a debt by gambling, courts have found that although it may have been foolish, there was no intent to deceive.[22]

> Section 523(a)(2)(A) was not intended to deny discharges to "debtors who made significant, albeit patently unreasonable financial miscalculations.  A debtor who honestly believes that gambling will create the necessary income to pay back his debts lacks the "scienter" required for a debtor to be nondischargeable on the basis of fraud."
>
> . . .
>
> The simple fact that many would consider [the debtor] foolish or that [the debtor] made significant financial miscalculations does not make [debtor] guilty of fraud.[23]

Like those gambling cases, in hindsight, the Debtor may have been foolish, and may have made significant financial miscalculations, but he did not act with the intent to deceive.  For that reason alone, TMBI's Section 523(a)(2)(A) claim is denied.

And even if the Court could find that the Debtor's conduct rose to the level of subjective intent to deceive (which it does not), this action fails because TMBI has not met the remaining elements required to prove fraud under Section 523(a)(2)(A). The only evidence asserted by TMBI to show that it relied on the debtor's representations was the testimony of Scott Bozak. Based on his testimony, the Court finds that TMBI did not rely on the debtor's statement that "everything is great" and "we should be good" to perform that evening. In his videotaped testimony, Bozak was asked if the debtor's statements had alleviated his concerns. Mr. Bozak testified that although it "relaxed him temporarily" he continued to walk around the facility to see the number of people there and his "concern never really went away."

And as to both the affirmative statements and the issued checks, any such reliance would not have been justified.[24] Justifiable reliance is assessed by "an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in light of the individual case."[25] When, under the circumstances, "the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or something which would serve as a warning that he is being deceived, he is required to make an investigation of his own."[26]

The Court finds it telling that Nerdapalooza was already in default by failing to make the second $12,500 payment before the band even flew to Florida. They Might Be Giants is an experienced band (founded in 1982) and a two-time Grammy award winner that has performed across the country for years. And the Court believes TMBI's agent and tour manager, Bozak was intelligent and more knowledgeable about the industry than the Debtor. Bozak testified that he owned and operated his own production company that provided tour management, "logistics, advancing and accounting" and that he appears at every venue on the road with each band. Bozak

testified that he was concerned all day with the lack of attendance. Bozak could have pulled the band at any time or further investigated Nerdapalooza's financial capacity, but he did not. The Court finds that under the circumstances of this case his reliance on any representation by the Debtor was not justifiable. The Court also questions whether TMBI proved proximate damages. TMBI appeared at the festival after Nerdapalooza was already in default. If, as TMBI argues, the Debtor should have told the band that they would likely not be paid because of the low attendance, the damages would still have occurred. TMBI would not have played but would still be out $37,500. For all of these reasons, TMBI's Section 523(a)(2)(A) claim fails.

As to TMBI's claim that the debtor's conduct was "willful and malicious" under Section 523(a)(6), this Court also finds in favor of the Debtor. To succeed under Section 523(a)(6), the creditor must prove that the injury at issue is both willful and malicious. Willfulness requires "a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another."[27] And the debtor must commit an act "the purpose of which is to cause injury or which is substantially certain to cause injury."[28] Malice requires that the debtor's act be "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will."[29] A negligent or even reckless act such as the Court has found happened here is not sufficient to except a debt from discharge under Section 523(a)(6).[30]

## Conclusion

TMBI has failed to meet its burden of proof under either Section 523(a)(2)(A) or 523 (a)(6) of the Bankruptcy Code. The Court will enter a separate judgment in favor of the Debtors on all counts of the Complaint.

---

[1] *See Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995); *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994).

---

[2] *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

[3] At trial, TMBI appeared to focus on false representations. To the extent TMBI asserts a false pretense or actual fraud, such claims also require proof of a debtor's actual intent to deceive. See *Veazey v. Sutton (in re Sutton),* 550 B.R. 917, 923 (Bankr. N.D. Ga., 2016).

[4] *SEC v. Bilzerian (In re Bilzerian),* 153 F.3d 1278, 1281 (11th Cir. 1998).

[5] TMBI has also argued that the Debtor made material omissions--that the Debtor should have informed TMBI that things "were not fine." The Court considers this just another side of the same coin. For all the reasons set forth in this opinion, any such omissions are also not actionable under Section 523(a)(2)(A) or 523(a)(6).

[6] *Kalmanson v. Nofziger (In re Nofziger)*, 361 B.R. 236, 243-44 (Bankr. M.D. Fla. 2006). Although the *Nofziger* court dealt only with Section 523(a)(6), there is no reason it should not also apply to Section 523(a)(2)(A). Moreover, even if *Nofziger* does not apply to fraud claims, fraud cannot be imputed from one corporate member to another. *See, e.g., Citizens Bank of Washington Cty. v. Wright* (*In re Wright),* 299 B.R. 648, 658 (Bankr. M.D. Ga. 2003).

[7] *Kuper v. Spar (In re Spar),* 176 B.R. 321 (Bankr. S.D.N.Y. 1994).

[8] *Bissett v. Ply-Gem Industries, Inc.,* 533 F.2d 142 (5th Cir. 1976).

[9] *See Designed Flooring Distrib., Inc. v. Wagenti (In re Wagenti)*, 110 B.R. 602 (Bankr. S.D. Fla. 1990).

[10] *See Southeast Bank, N,A. v. Hunter (In re Hunter),* 83 B.R. 803 (M.D. Fla 1988).

[11] *Id.*

[12] *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir. 1986)(abrogated on other grounds by Grogan v. Garner, 498 U.S. 279 (1991)).

[13] *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994).

[14] *Id.*

[15] *See Miller*, 39 F.3d 301.

[16] *Id.*

[17] *DSC Nat'l Props., LLC v. Johnson,* (*In re Johnson)*, 477 B.R. 156, 171 (10th B.A.P. 2012).

[18] *See Johnson,* 477 B.R. at 171-72.

[19] *Gaft v. Sheidler (In re Sheidler),* No. 15–8011, 2016 WL 1179268, *5 (6th B.A.P. Mar. 28, 2016).

[20] *See Johnson,* 477 B.R. at 171.

[21] *Acceptance Loan Co. v. Christopher (In re Christopher),* 578 B.R. 842, 849 (Bank. S.D. Ala. 2017).

[22] *See Rembert v. Citibank South Dakota, N.A.*, 219 B.R. 763 (E.D. Mich. 1996), *aff'd*, 141 F.3d 277 (6th Cir.1998), *cert. denied*, 525 U.S. 978 (1998); *AT & T Universal Card Serv. v. Crutcher (In re Crutcher)*, 215 B.R. 696 (Bankr. W.D. Tenn. 1997).

[23] *Chevy Chase Bank, FSB v. Briese (In re Briese)*, 196 B.R. 440, 453 (Bankr. W.D. Wis. 1996).

[24] And there could be no finding of reliance on the second check at all, since it was issued after the performance. In addition, because it was issued after the performance, it could not be a debt "obtained by fraud."

[25] *City Bank & Trust Co. v. Vann* (*In re Vann),* 67 F.3d 277, 288 (11th Cir. 1995).

[26] *Id.*

[27] *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163 (11th Cir. 1995) (internal quotation marks omitted).

[28] *Walker,* 48 F.3d at 1165; *See also Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998).

[29] *Walker,* 48 F.3d at 1164.

[30] *Kawaauhau v. Geiger*, 523 U.S. 57 (1988).